Next case for argument is 15-2067, Eli Lilly and Company versus Teva Medicines. Good morning, Your Honors. Why don't we give everybody a chance to settle in. I apologize. No, that's quite all right. Okay, Mr. Jay, I think we're good to go. Thank you, Your Honor. Good morning. This case, as the Court knows, presents three issues, one infringement question, and we've presented two invalidity questions on appeal. I'd like to begin with the infringement question, the issue on which there are a number of amicus briefs and on which the district court's decision is novel, legally erroneous, and should be reversed. The divided infringement question here is whether the doctors exercise enough control over the actions of their patients that the doctors and the patients should be considered a single unit for purposes of infringement, that the doctors should be held legally responsible for the actions of the patients. The district court held that there was enough control here, but on these facts, instructing a patient to take an over-the-counter pill in one of many forms, either a multivitamin or any of the various commercially available folic acid supplements, on any five days within a period and within a wide range of amounts prescribed in the patient information, that's not enough control to attribute the actions of the patients to the doctors. Why not? What would be enough control? I mean, we here lived through years of acami and a discussion of what direction and control meant, and why isn't it enough? I mean, both experts, I think experts on both sides testified that it was standard practice for doctors to withhold the treatment if patients didn't take the folic acid. And I think there's lots of evidence. These were instructions. This is what they were required to do. They were compelled to do it. The doctors wouldn't provide the treatment if they didn't do it. I mean, unless we're going to have some requirement of a contractual relationship, it seems to me this is pretty strong direction and control. Well, we don't think so, Your Honor, but we're not here advocating for a contractual relationship and nothing else as a bright line. But what we are arguing for is that you should apply the same standard in the doctor-patient context that you would apply in other patent cases. You look at whether there is a legally sufficient indicia of control. Now let me go right to what your question was about, which is the withholding of treatment. I want to point out that is not what the district court made findings on. That is not what the district court premises decision on. If you look at A27, the district court says it was going to look at three things. The district court was going to look at the patent itself. That's the first legal error that the district court made, and I'm going to come back to that. But also the patient information and the prescribing information. There's nothing in either of those documents that talks about withholding treatment. Wait a minute. I mean I don't know. Obviously there's a lot of paper here. I'm looking. Didn't you call out A27? Yes, Your Honor. All right. Well, A27. Maybe I'm looking at the wrong thing. But it does say on that page, reading quickly, if the patient fails to carry out the step, he or she will not receive the benefit of the patented method. The benefit of the patented method. Now what the court is saying there is not the doctor won't give you the treatment. The court is saying you won't get a reduction of potentially life-threatening toxicities. In other words, that's just saying if you don't take folic acid, not whether you follow the patented steps, but if you don't take folic acid, you'll be at risk of toxicity. That's just assuming the conclusion. That's saying that here's a step in a patented method, and if you, actor number one, here the patient, don't perform this step, well then you won't share in the benefits of performing the patented method. And it does also say the physician, based on the patented method, directs the manner and timing of the patient's ingestion of folic acid. That's what the court said, which is not about the doctor withholding treatment. Suppose the court had found physicians withhold the treatment unless the patient takes folic acid. Is that direction of control? If I may vary the question a little bit, if they said that the doctors withhold treatment unless the patients take folic acid within the range claimed in the patent or within the specified range, but we don't have a finding to that effect. What's the answer to that? I think the answer is yes. That is direction of control. I think we're not disputing that. But we don't have that here. So there seems to have been a lot of testimony that that's what doctors do, even if there's no finding here by the district court. The record suggests that that's the only finding that could be made with respect to that. Respectfully, I don't think so, Your Honor, because of the qualifier that I wanted to insist on in response to your question. While there is testimony about doctors insisting that their patients take folic acid, there's no evidence about the range in particular, insisting on the range in particular, and saying, for example, if you've come in and you've taken 1,001 micrograms of folic acid, go away, I won't give you the treatment. That's the level of direction of control that might satisfy this court's cases and hold one actor legally responsible for the other. Well, the prescribing information, and clearly we're back to page 827 where the conclusions of the district court with prescribing information clearly directed them to do that specifically. Directs? To take a specific amount, instruct the patients to initiate a certain amount of folic acid, et cetera. Well, it's a certain amount of folic acid. In the prescribing information, it's 400 micrograms to 1,000, which is slightly different from the patented range. But we don't think that that broad range, you can take any amount within a wide range. First of all, directing the patient to do that isn't enough direction or control because of the other aspects of this case that give the patient a lot of freedom about what to take. Do you take a multivitamin? Do you take one of the many commercially available alternatives? When do you take it? What this court's cases have said is that direction has to be over the manner and timing of performance. We don't think that just saying take somewhere between 400 and 1,000 micrograms is enough. Doctors give an awful lot of advice to patients. Take two over-the-counter aspirin. Take with food. Take on an empty stomach. Take after a good night's sleep. So if the doctor gives conflicting advice or advice outside of the label, why does that invalidate the patent? That's my question. If the doctor gives advice outside the label, in other words, the doctor says my practice is to do something more than the label requires me to do? I think you're telling us that there are limits that may or may not be respected. If I'm understanding Your Honor's question. I'm trying to understand your argument. I'm saying that the doctor would have no reason to insist on performance within the patented range, the point that I made about 1,001 micrograms. Yes, exactly, but why does that invalidate the patent? We're not saying that it invalidates the patent. We're saying that the fact that if the doctor wouldn't care if the patient comes in having taken 1,001 micrograms or 1,002 micrograms or 1,100 micrograms, then the doctor isn't exercising the level of control over how much the patient takes, which is necessary for the patient's selection of a particular amount within the range, which would be necessary for infringement, to be attributable to the doctor. This whole exchange is turned on whether the doctor is insisting that the patient do very specific things or giving advice that's much further along the continuum, closer to take two aspirin or take on an empty stomach. I'm not following this, Your Honor. Suppose the doctor tells the patient, I won't give you this medication unless you take folic acid 400 to 1,000 milligrams orally once a day beginning seven days before the first dose of L-team. If that instruction were given by the physician to the patient, would that satisfy the infringement requirements? I won't give you Pemetrexid. I think the doctor would have to say that and to follow through on it. To verify not only did you take some folic acid, but also to verify the amount. That, I think, would be necessary for the relevant level of control to be exercised. But if he did say that and verified it, that would be infringement? I think that could be the right level of control, yes. We're not arguing with that. We are saying that that's not what was established here and that it was the other side's burden to establish not only that, but also that even if they could find a doctor who exercised that level of control over the particular amount, that they would have to show that our clients are responsible for that, that they've induced the doctors to do that. The district court found that inducement in the labeling and nowhere else. It said that the mere fact that you say in the labeling— Why can't we assume that the doctor is going to follow through on what they're told to do in the labeling? I don't think that the labeling directs them to— the labeling certainly doesn't direct them to withhold Pemetrexid treatment. The labeling, in particular, if someone has a healthy folate level in their blood, but they've taken slightly too little or slightly too much folic acid, and there are lots of other ways to get folate. It's in a lot of food. It's supplemented in preserved foods. There are reasons why a doctor would not say, I'm not going to give you this life— I want to make sure I got all my knots right. The doctor would not say, I'm not going to give you this life-saving treatment because you took just a little bit too much folic acid. There's no evidence that the doctors are so focused on the amounts. If I may, I'd like to say a bit about the indefiniteness issue in my time here. The question here is whether vitamin B12 has a sufficiently definite meaning to a person of skill in the art. The patent uses vitamin B12 in different ways, and it is common ground, I think, that there are different ways accepted in the art, different things that vitamin B12 can mean. It can mean either specifically cyanocobalamin, or it can mean something broader. Yeah, but it's true of this issue, and it's true of a lot of issues. The district court made findings. There were experts that testified. She believed some—she credited some and not others. On this issue, I recall that the experts did agree that B12 is used as a vitamin supplement for use in medical context. B12 is synonymous with that word I can't pronounce. Cyanocobalamin. And no, Your Honor, this is a very important point. I'm glad you brought it up. But the findings, first of all, the other side's expert testified not just about what the ordinary meaning was. If you look at 3821 of the appendix, you'll see that the expert was declaring what he thought the meaning in the claims to be. In other words, he was being an expert not about just ordinary meaning, but he was actually trying to interpret the patent, and that's just the kind of extrinsic evidence that this court does not defer to, especially when our argument about indefiniteness is based squarely on the intrinsic record, on the specification itself. Well, I know you may know more about TEVA than I do, but it seems to me that her accepting Dr. O'Dwyer's representation, that a person of ordinary skill, how we would understand B12 to mean it, is maybe come under the bucket of extrinsic evidence, right? It's extrinsic. But after all, in TEVA itself, the debate in TEVA itself was whether there are different ways to determine the meaning of a particular testing method, and you couldn't tell based on the intrinsic record, this court said, which one was to be used. And there was a finding. There was an expert, and this is explained in the court's opinion in Dow just recently. There was a finding by the district court that a person of skill in the art could in fact tell by looking at the specification which one was meant, and this court said that's not a proper use of extrinsic evidence. We will not defer to it. We will instead, because the intrinsic evidence is in conflict, we will hold the patent fatally indefinite. That was this court's holding on remand in TEVA and further explained in Dow where likewise the patent was found indefinite. And your other question, Chief Judge, was about whether cyanocobalamin is the only one used as a supplement, and that simply is not so. Hydroxocobalamin is also used as a supplement, not only that, as an injectable supplement, and this after all is a patent that specifically says that the B12 will be injected. And actually if you look at A750-51, this is after the claim construction. It's a testimony from the trial, but it is about the use of hydroxocobalamin as a supplement in the UK and in Europe. So there certainly is no basis for saying that if supplement, then cyanocobalamin. Certainly nothing that could overcome the conflict in the intrinsic record itself. If you look at the claims, there's B12 and there's cyanocobalamin, which would tell someone reading the claims that these are different things. They're not synonymous. And that is backed up by the lengthy discussion, I think in, I guess, Column 6, where it says vitamin B12 refers to, and there's a long list of substances, and refers to the chemical derivatives as well. And what a person of skill in the art needs to know is, can they design around this claim by using a vitamin B12 variant that is not one of the ones specified, but that would be picked up by that broader meaning? Or is vitamin B12 just cyanocobalamin? There's no way to tell that from the intrinsic record. You've gotten to your rebuttal time. I'll restore three minutes for rebuttal. Thank you. Good morning, Your Honor. May it please the Court. Adam Perlman on behalf of Eli Lilly. Let me start with the question that Judge Prost asked about the district court's findings on infringement. And it is, in fact, the sentence immediately before the one that Judge Prost read aloud on page 827. The court says it is clear from the patent, the prescribing information, and the patient information that taking folic acid in the manner specified is a condition of the patient's participation in pemetrexid treatment as described in the patent. That is a finding based on the undisputed evidence at trial that if the patients do not take folic acid as directed by their physician, the physician will not provide them with pemetrexid. That is supported exactly by the label, which I will take you through in a moment. And it's also undisputed that that is the uniform way in which medicine is practiced in this country with pemetrexid. Is there necessarily inducement if the product labeling for a drug and nothing more contains instructions as to the steps? Is that enough for instance? Yes, in the ANDA context, because there's been no actual sales, if the label – this is the court's AstraZeneca opinion, which I believe your Honor authored – if the label encourages or recommends steps that would cause at least some users to infringe, from that we infer intent to induce infringement by the party using that label and selling the product. And in this case, if you look at the physician label, it's multiple times in the label. It's on the first page twice, but I'll take you to A11258, Section 5.1 of the label. The heading is Requirement for Premedication and Concomitant Medication to Reduce Toxicity. And it's undisputed this is directed to the physician and is the instructions to the physician about how to administer the drug. And it says prior to treatment with Olympta, initiate supplementation with oral folic acid and also B12 – I'll skip that – to reduce the severity of hematologic and gastrointestinal toxicity of Olympta. And it goes on and says in clinical studies where people didn't do that, very severe toxicities occurred, including death. And what that is saying to the doctor – I guess the problem here is it seems to me in reading Akamai, whether just a direction to the physician to get the patients to do this is sufficient, or does there have to be evidence of some sort of enforcement mechanism or practice by the physicians with respect to that? And the argument is that there isn't evidence here of an enforcement mechanism with respect to the specific doses and schedule, right? Well, that is the argument, and the district court made findings on this, and the evidence at trial was undisputed on this, that based on the label, the label says as a physician you must – I guess what I'm asking is, is the label alone sufficient to bring about direction? So in this case, the label alone is sufficient for us to prevail. But in this case, we have both the label and undisputed evidence about what happens in the real world in response to this label, because unlike some of this court's cases that the defendants have cited where the generic had carved something out of the label and the question was, was there some sort of vague intimation that would sort of bring in the thing that was carved out, the defendant's label is identical to the Olympda label. That's why the trial was conducted on the basis of the Olympda label, and we have years of real-world experience about what the label induces physicians to do in treating patients with pemetrexid. Both sides' experts agree that all physicians uniformly require patients to take folic acid as a condition of receiving pemetrexid. And just like in Akamai, you could – But not necessarily in the doses on the label. Yes, in the doses on the label. Where does it say that? Well, it says – where does the label say that or where does the evidence say that? Where does the evidence say that? The evidence is at – the district court cited this on A-28, but at A-2196-97, Dr. Chabner essentially says that the physician is in control and tells the patient what dose to take, and if the patient does not do what the doctor says in terms of taking the folic acid as directed, the doctor will not give the pemetrexid. And I will say that in an ANDA case – It seems to me a bit different than saying that physicians make a practice of telling them, if you don't take a specific dose, you won't get pemetrexid. Well, one, we look at the label and presume that the physicians and the patients follow the label. The evidence is that they do, but we presume that in the ANDA case. Well, that's the – that comes back to my question, is the label alone enough? Because it doesn't seem to me that there is evidence that physicians require the kind of specific compliance as a condition that would bring their actions within the limits of the patent. Well, I think there is that testimony. I think it's on the pages that I cited. But I think the label is sufficient here because in an ANDA case, the point is that if the acts on the label are performed, would there be infringement? Here the label says the patient has to take 400 to 1,000 on the schedule set forth in the label, and if they do that, and if the doctor tells them to do that, they can have pemetrexid. And if they don't, they can't have pemetrexid. And in Akamai, remember, it was condition participation in the activity and – I forget the exact word, but essentially direct the manner or the timing of the practice of that step. And here we have the doctor telling a patient take folic acid orally starting seven days before, take folic acid in this dose. I mean, there's a bit of a red herring going on here about whether the doctor says a specific dose within the label range of 400 to 1,000 or whether the doctor says go ahead and take anything within the range of 400 to 1,000. What's the range in the patent? Well, the range in many of the claims of the patent is 350 to 1,000. So it's completely – most of the claims are completely subsumed by the entire range. We have a couple, three claims that say 350 to 600, but under Synovian they are seeking approval for doses within that range, 350 to 600. And I lost my thought for a moment. Sorry. That's all right. No, no, Your Honor. It doesn't matter for infringement. The only relevant – I heard Mr. Jay talk about all the things that you can go to the pharmacy, you can get a multivitamin. The only thing you have to control under Akamai or direct under Akamai is the practice of the claim element. You don't have to control the rest of the patient's life in relation to that element. And here the requirement is that they take a certain amount of folic acid on a particular schedule as directed by the doctor. Well, how do they enforce that requirement? That's part of Akamai. You can't just – Absolutely. And they enforce that requirement because they inquire of the patient, have you done this? And the label tells them to do that. It says you have to initiate folic acid before you, the doctor, who are in unique control of giving Pemetrexid because it's prescription and it's by infusion, before you give that Pemetrexid, you must initiate folic acid. The testimony was, and the district court found, that the inverse of that is equally true from the label, that if you haven't successfully initiated folic acid, if the patient hasn't taken it, don't give the Pemetrexid. And the reason for that is very logical. The whole reason anyone is doing this, and it's set forth right in the label, is that patients were dying in the phase three clinical trial when they were not supplemented in advance with Pemetrexid. Where is the testimony that they conditioned it on a specific dose? If it's not at the page I cited to you, I believe it is. I didn't look at the page. This court cites it as A28, and she cites to 2196 to 97 in the appendix, and I think we have other citations probably in our brief. That is the one I brought up to the podium with me. But, Your Honor, the idea that— Wait, wait, wait. Okay. Let's see. 21, what is it? 96 to 2197. So we're— Okay. Use a standard dose. That's 1,000. And that's within the patented range, 1,000? Yes, sir. We have claims that go 350 to 1,000. We have other claims that go 350 to 600, which, as I say, the former claims all completely subsume the label range, and the 350 to 600 claims overlap with the label range, and so the label is inducing the practice of those claims. Now— I didn't get that last one. Okay. If the range in certain claims is 350 to 600, and they're prescribing 1,000, that comes within the range? No. So, Your Honor, the question in the end of the case is what is the— this is under Synovian— what is the label seeking approval for? And the label is seeking approval for a regimen in which doctors can say 400 up to 1,000. Because 400 is within the label, 450, 500 are in the label, and that overlaps with the claim. That is infringement of the claim under this court's Synovian position. If you conclude that the 400 to 600 claims aren't infringed, does that make a difference in the outcome? It makes absolutely no difference. The 350 to 1,000 claims are absolutely infringed, and it makes absolutely no difference. Let me just say I want to make one final point on infringement, and then I want to move to the nautilus issue. We heard a couple arguments about how doctors say, go ahead, take an aspirin, eat better, give all kinds of instructions. This is not that kind of instruction. People were dying in the clinical trial, and the way that the FDA and Lilly agreed to address that was to say, doctors, you have to give them folic acid and B12 before they get this medicine, and you have to instruct the patient they have to do it. And the label tells both patient and doctor, you have to do it. And the idea that the argument that we're getting from the defendants is what all the label really induces is for the doctor to say to the patient, take some folic acid and I otherwise wash my hands of the situation. I think it's not a credible reading of the label. The district court made a fact finding regarding the label. There was testimony about the label. I don't think there's any error at all. But even if there were error, it's certainly not clear error. The label and the undisputed testimony support infringement. The district court should be affirmed. Let me turn to nautilus, and let me clear something up. Judge Prost was absolutely, pardon me, Chief Judge Prost, was absolutely correct. The evidence before the trial court was that in the context of giving a vitamin supplement to a patient, when physicians say vitamin B12, they mean cyanocobalamin. There is one established meaning. The fact that hydroxocobalamin might be given as a supplement is irrelevant. No one calls it B12. They call it hydroxocobalamin. The district court made that finding at page A85 of the appendix. The argument was, well, if you look back at the expert's report, he testified as to both the ordinary understanding of the term in the art and also the ultimate conclusion of what the construction of the claim should be. That's a true statement. The district court, though, accepted the factual testimony regarding what the ordinary meaning of the art is, as is clear from her opinion. The fact that his testimony on the ultimate issue may not be entitled to deference, the testimony that led to the finding that the ordinary meaning in this context is cyanocobalamin was made by the district court and entitled to clear error review, and they've established no clear error. Now, that distinguishes this case from both Dow and Teva, both of which were about terms of measurement that could have different meanings in the art, and in neither case was there an established default meaning to the person of ordinary skill. And the evidence in this case is that there is such an established default meaning, and it is cyanocobalamin, and the district court made a finding in that regard. Let me briefly touch on this issue about the specification and Column 5 and this vitamin B12 refers to paragraph that Mr. Che mentioned. And no one is arguing that this is an express redefinition of the term vitamin B12. The district court found that it wasn't, and the defendants aren't arguing on appeal that it was such that it should be applied. And looking at the patent, that's obviously correct, because one, as the district court held, for other terms, it says as used herein, it means this, as used herein, it means this. It doesn't do that for B12. But more importantly, this paragraph doesn't purport to define what vitamin B12 means. It says vitamin B12 refers to vitamin B12 and its pharmaceutical derivatives, and that is putting the reader on notice on what was accepted by everyone in the trial court that the term has different meanings depending on the context that it is used, either broader or narrower, but in the context of the patent, which is about administration of a supplement to a patient, it has one and only one meaning, and that is cyanocobalamin, and that is supported by the structure of the claim itself. Claim 1 says B12 and a variety of other listed agents, and then claim 2 says wherein the agent is vitamin B12. It is entirely consistent with vitamin B12 meaning cyanocobalamin, and claim 2 is therefore narrower than claim 1. The argument that we saw in the brief, and I suspect we're going to hear on rebuttal, is well, there's a redundancy in claim 1 because cyanocobalamin is also there. Under either established meaning in the art, either cyanocobalamin or all cobalamins, there's a redundancy in claim 1. That's a fact. It just is. And while this court's cases say we prefer that claim terms have distinct meanings, it also holds that when two terms are properly construed to mean the same thing, then so be it. That's what they mean. Here there are two established meanings. No one has ever suggested that there's a third meaning, and they both lead to a redundancy, which tells you that looking for a redundancy isn't going to resolve this question for you, but looking at claim 2 does resolve this question for you because it couldn't be the broad meaning. It has to be the narrow meaning, or otherwise claim 1 is not narrower than claim 2. I'm coming to the end of my time. There was also an obviousness, and obviousness typed all the patenting issues raised. I don't have anything to say on that. If there aren't any questions on that, and if there are no further questions from the court, I will sit down. Thank you. Thank you, Your Honors. I want to correct one page reference that I gave you before. 3621 is where the expert made clear he was opining on what's in the claims, what the meaning is in the claims. Mr. Perlman, to go back to the divided infringement point about the labeling, Mr. Perlman relied on the word requirement in the prescribing instructions. But if the argument were that everything in the prescribing instructions is telling you that if this isn't precisely followed, withhold pemetrexid, including the quantity and everything else, then you wouldn't have what you have in the patient instructions because the prescribing instructions say take it every day. The patient instructions say take it five out of every seven days. That's in there because patients missed doses. So you just can't get out of the prescribing instructions that absolutely everything in here is a sine qua non, it has to be followed exactly, or you will withhold treatment. You certainly can't say that if there are individual doctors who follow, who go overboard and do what is quoted on the page that Mr. Perlman relied on, do things like require patients to have pill diaries, bring in empty bottles, and prove that they've taken their pills. Even if there are doctors who do that, that is not required by the labeling. That's not something that is induced by TEVA, and it's not something that can be attributed to the alleged induced infringer. It's certainly true that you don't have to control the other person's entire life in order to be deemed the same unit for direction and control purposes under divided infringement. What you do have to control is the manner and timing of what the person does. That's why the court in Akamai, for example, was emphasizing that Limelight was directing its customers to follow these precise steps. If there isn't that level of direction, then they aren't going to be considered the same unit for purposes of divided infringement. The thing to remember on divided infringement really is that this is a drafting issue. It's a drafting issue and an assertion issue as well. We wouldn't be talking about the quantities. I think Judge Dykes' colloquy with my friend brought out the importance of the quantities in the claims that Lilly chose to assert. They could have tried to go to trial on claim one, which doesn't have the quantities in it, but they chose instead to go to trial on the claims, perhaps for validity reasons, that have a specific quantity in it. They have to live with that choice. If they're concerned about divided infringement, there are ways to draft claims that avoid the divided infringement question. That's something that this court has emphasized in all of its method claim cases, and the same is true here. If you focused on the advice of the doctor rather than the patient administering the folic acid, then you wouldn't have this issue. To switch gears and go to the indefiniteness issue, I'll just say that my friend said that Column 5 doesn't redefine B-12. Well, that's exactly the point. Column 5 recognizes that B-12 has another meaning, a broader meaning that includes all of these pharmaceutical derivatives, and that is where, for example, hydroxycobalamin is called B-12, right there in the patent. The very fact that there are two meanings and the intrinsic record doesn't allow you to select between them and the redundancy, if anything, suggests that the narrower meaning isn't correct, that's why this patent is indefinite. It doesn't give enough information to design around the claim invention and figure out whether you could use a different derivative of B-12. Thank you very much. Thank you. We thank both parties and the cases submitted.